## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **DOROTHY CHAPPELL-JOHNSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 06-0314 (RCL)** |
| **MARTIN GRUENBERG,** | ) | |
| **Chairman, Federal Deposit** | ) | |
| **Insurance Corporation,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION
## FOR SUMMARY JUDGMENT

### INTRODUCTION

Plaintiff Dorothy Chappell-Johnson sued her employer, the Federal Deposit Insurance Corporation (FDIC), alleging that because of her race, age and reprisal for prior EEO activity she was denied promotion to a Human Resources Specialist position for which she was the most qualified candidate, having performed the duties of the position for more than six years in earlier assignments with the FDIC.

In its pending motion for summary judgment, the FDIC asserts that it is entitled to summary judgment because it selected the best available candidates and that in absence of direct evidence of discrimination the Court may not critically examine this assertion. Defendant also contends that Chappell-Johnson cannot establish a *prima facie* case of retaliation claiming that there is no causal connection between plaintiff's prior EEO activity and her non-selection. However, as demonstrated below, there are issues of fact regarding the selecting official's knowledge of plaintiff's earlier EEO complaints and the selecting official's involvement in the

attempt to mediate an earlier EEO complaint filed by Chappell-Johnson, as the selecting official

had calculated certain benefits that might inure to plaintiff under a possible settlement of one of

Chappell-Johnson's EEO complaints.  The selecting official's involvement in Chappell-Johnson's

earlier, ongoing EEO cases was reasonably close in time to the non-selection at issue in this case.

Defendant also asserts that Chappell-Johnson cannot establish a *prima facie case* for race

and age discrimination, alleging the selection was based upon a legitimate nondiscriminatory

reasons - that it selected the best candidate.  However, as demonstrated below, there are issues of

fact about irregularities in the interview and selection processes that would allow a reasonable

jury to reject defendant's claims that the younger, white candidate selected for the position was

the best qualified candidate.  For these reasons, defendant's motion must be denied.

## STATEMENT OF FACTS

### I.    Ms. Chappell-Johnson's Career at FDIC.

Ms. Chappell-Johnson is a 61-year old, black female.  She has been employed at the

FDIC, or its predecessor organization, the Resolution Trust Corporation ("RTC") since 1990.

Prior to the merger between the RTC and FDIC, Ms. Chappell-Johnson was a grade CG-11.

However, as a result of a 1996 reorganization after the RTC and FDIC merger, she was reduced

to the CG-9 level, thus losing potential promotion opportunities to higher-graded positions.

Also, during a reduction-in-force ("RIF") action by the FDIC management, Ms. Chappell-

Johnson was reassigned and downgraded to a CG-8 position in approximately August 2003.

Chappell-Johnson is currently employed as a Human Resources Specialist (Benefits), at the CG-

201-9 level, serving in the FDIC, Division of Administration.  *See* Plaintiff's Exhibit ("PX") 1

(Chappell-Johnson Affidavit, dated November 12, 2004).

During an approximate four and one-half year period, April 1992-September 1996,

Chappell-Johnson served as a (Chief) Supervisor, Payroll/Personnel System Specialist.  PX 2,

Chappell-Johnson Application for Vacancy Announcement # 2003-HQ-2419 (Human Resources

Specialist (Information Systems and Compensation)), CG-0201-11/12) at 2-4.  In that position,

Chappell-Johnson performed a "variety of professional and technical support duties in

connection with the processing of the full range of personnel actions and payroll documents."

PX 3, Position Description, Supervisory Payroll/Personnel System Specialist, GG-301-11 at 2.

In addition, Chappell-Johnson's duties included, *inter alia*

> Investigates and response to a variety of recurring and complex inquiries
> regarding payroll and/or personnel matters; oversees the computation and
> processing of variety of salary related payments which must be paid manually;
> reconciles payroll/personnel suspense reports; provides advice, guidance and
> assistance to administrative personnel in the resolution of complex payroll and
> personnel processing problems; interprets external processing procedures and
> reports and, participates in the testing and implementation of system
> modifications and changes.
>
> Participates with higher level supervisors and other management officials in
> discussions which contribute to the design and development of various systems or
> procedures to improve the operating efficiency and effectiveness of the Unit.
>
>     *        *        *        *
>
> Maintains contacts with representatives from Offices/Divisions throughout the
> Corporation to identify and resolve payroll/personnel related issues and problems.
>
>     *        *        *        *
>
> Performs system and manual quality control reviews to check the accuracy of
> input and output information.  Ensures the accurate and timely input and retrieval
> of data by Unit employees for all payroll and personnel actions.  Develops
> standard procedures and policies for operating the automated payroll/personnel
> system, and devises new methods to accomplish work objectives.  Ensures that all
> necessary corrections are made in a timely manner by appropriate subordinate
> employees.

       \*       \*       \*       \*

> Continuously reviews new and/revised regulatory material such as Federal and
> Corporation personnel and pay regulations, NFC [National Finance Center]
> Directives and, Comptroller General Decisions, etc. As required issues written
> and/or oral instructions and special procedures to clarify published guidelines.
>
> Contacts representatives of the NFC to discuss and resolve day-to-day problems
> and activities and coordinates their resolution. Advises subordinates of changes/
> enhancements to the system, as well as changes to system policies and procedures.
>
> Utilizes the PINQ inquiry system and the FOCUS/CULPRIT system in order to
> produce reports on a regular or ad hoc basis; this requires in-depth knowledge of
> the NFC system or order to obtain the desired information in a useable format.

*Id.* at 2-3. In addition, for approximately two years (June 1990-April 1992), prior to being

promoted to CG-11, Chappell-Johnson served in the same position at the CG-9 level performing

essentially the same duties that she performed as a CG-11. PX 2 at 2. During the period 1993-

1996, Chappell-Johnson's performance of her duties was rated at least as "Successful." PX 4,

(Natalie Tyce Dep.) at 28. During an approximate six-year period, 1996-2003, and up to the

point that she applied for the vacant position that is involved in the instant matter, Chappell-

Johnson served as a Personnel Management Specialist, Grade 9, with the FDIC. PX 1 at 1.

## II.     Ms. Chappell-Johnson's Prior EEO Activity.

Since 1998, Ms. Chappell-Johnson has applied for and been denied multiple promotions

within FDIC. Therefore, she has filed a number of formal administrative EEO complaints

against the FDIC. Defendant's Exhibit ("DX"), Susan Berman Declaration at ¶ 4. The selecting

official for the position vacancy that is at issue in this case, Shirley Purnell, was aware of and

involved in addressing Chappell-Johnson's prior EEO complaints. Indeed, Purnell was

specifically involved in the preparation of a settlement offer from the FDIC to Chappell-Johnson.

PX 6 (Purnell Dep.) at 173-74, 197-98 (provided position description to investigator for prior

EEO complaint(s) filed by Chappell-Johnson); *see also* PX 5 (Purnell Affidavit, dated December

15, 2004) at ¶ 18; *see also*, PX 1 (Chappell-Johnson Affidavit, dated November 12, 2004) at ¶ 6

(in February/March 2004, Chappell-Johnson's Official Personnel Folder was signed out to

Purnell, while the legal department was preparing a settlement offer for the EEO complaint

Chappell-Johnson had filed in 1998).

In addition, during the time of period that Ms. Chappell-Johnson was being interviewed

but not selected for the vacant position at issue in this civil matter, Ms. Purnell had signed out

Chappell-Johnson's Official Personnel Folder.  PX 1 (Chappell-Johnson Affidavit, dated

November 12, 2004) at ¶ 6 ("In February or March 2004, I requested an opportunity to review my

Official Personnel Folder and discovered it was signed out to Shirley [Purnell].  She would have

known of my prior EEO activity because it was at that time that the legal dept. [sic] was making

a settlement offer for the EEO complaint I filed in 1998.").  Ms. Chappell-Johnson was

interviewed for the vacant position in mid-February 2004, and Ms. Purnell formalized her

selection of Ms. Quattrone on March 5, 2004.  *See* PX 7, FDIC Form 2100/15, Candidate

Selection Form.

**III.    Ms Chappell-Johnson Applies and is Interviewed for a Human Resources Specialist (Information Systems and Compensation), CG-201-11/12 Position at FDIC.**

In November 2003, the FDIC advertised for a vacant Human Resources Specialist

position in the Division of Administration, Human Resources Branch, HR Service Center,

Operations, in Washington, D.C.  PX 8, Vacancy Announcement # 2003-HQ-2419 (Human

Resources Specialist (Information Systems and Compensation)), CG-0201-11/12.  The

announcement provided that the position could be filled at either the CG-11 or CG-12 grade,

with the full performance level grade at CG-12. *Id.* at 1. The announcement also delineated a

summary of duties for the position, as follows

> Serves as senior technical advisor on payroll/personnel operations and undertakes
> trouble-shooting assignments involving the most difficult and sensitive issues.
> Serves as technical resources in the development of HR policies, procedures and
> guidelines affecting the Corporate Human Resource Information System (CHRIS).
> Assists in conducting broad analyses of the National Finance Center (NFC)
> system, defining issues and recommending solutions to complex operational
> problems. Serves as Liaison with officials at the NFC to solve broad and complex
> information systems and compensation-related problems. Responds to inquiries
> from employees, management officials and outside groups, including the
> Congress, recognized labor organizations, and others concerning HR Systems and
> compensation-related issues. Reviews and approves salary advances, authorizes
> payments for corrections to NFC system errors, and authorizes retroactive
> payments to employees resulting from lawsuits, discrimination complaints, and
> other actions taken against the Corporation in which employees are entitled to
> settlements. Coordinates and conducts audits of Corporation pay personnel
> operations activities and to validate the accuracy of financial/pay information
> provided in the disclosure documents to Corporation executives at the highest
> levels. Provides senior level expertise in pay issues and prepares policy changes.
> Develops standard operating procedures on new methods to accomplish work
> objectives.

*Id.* at 2. The vacancy announcement also identified individual knowledge, skills, and abilities

(KSAs) that included:

1.   Knowledge of U.S. Office of Personnel Management regulations,
     guidelines, and pertinent laws concerning compensation and pay
     administration.

2.   Knowledge of the National Finance Center (NFC) payroll/personnel
     system.

3.   Ability to conduct comprehensive analyses of automated human resource
     information systems.

4.   Ability to analyze, evaluate and make recommendations to senior level
     management officials.

5.    Ability to establish and maintain customer service and smooth working relationships with a variety of offices and individuals at all levels.

*Id*. at 2-3.

The position description for the vacant position at the CG-11 level had previously been the position description for the position of Payroll/Personnel System Specialist, GG-301-9.  PX 9, Position Description, Human Resources Specialist (Information Systems and Compensation), CG-201-11 (Line 4(b) - "Previously - Payroll/Personnel System Specialist, GG-301-9").  Ms. Chappell-Johnson had performed those duties while also serving as a supervisor for several years.  PX 2, Chappell-Johnson Application, at 2-4.

**A.    Chappell-Johnson's Application Demonstrates That She was the Most Qualified Candidate for the Human Resources Specialist (Information Systems and Compensation) Position.**

Ms. Chappell-Johnson submitted a timely application for the CG-11/12 Human Resources Specialist (Information Systems and Compensation) position.  PX 2, Chappell-Johnson Application.   Her application noted that she had been a served as a CG-9 and CG-11 Supervisory Payroll/Personnel Systems Specialist.  *Id*. at 2-4.  Indeed, the duties identified in the summary section of the vacancy announcement were duties that Ms. Chappell-Johnson had performed during the period 1990-1996, when she served successively as Supervisor, Payroll/Personnel System Specialist at the CG-9 and CG-11 levels.  *See* PX 2, Chappell-Johnson Application at 2-4 and PX 3, Position Description, Supervisory Payroll/Personnel System Specialist, GG-301-11.   Chappell-Johnson had performed those duties as a supervisor, at both the CG-9 and CG-11 levels, and done so successfully.  PX 4, (Natalie Tyce Dep.) at 28 (rated Chappell-Johnson at no less than "successful" level).

Therefore, by virtue of her previous successful performance as a Supervisor, Payroll/Personnel System Specialist, Chappell-Johnson was uniquely qualified to serve in the CG-11, Human Resources Specialist (Information Systems and Compensation) position. *See* PX 6 (Shirley Purnell Dep.) at 178-190 (agreeing that the position description for the former position, CG-9, Payroll/Personnel System Specialist, and the Summary of Duties in Vacancy Announcement # 2003-HQ-2419, are very similar and contain a lot of the same language). Moreover, Chappell-Johnson had served as a Personnel Management Specialist since January 1997 - a period of nearly seven years prior to applying for the vacant position of Human Resources Specialist (Information Systems and Compensation. *See* PX 2 at 1.

In fact, Chappell-Johnson's application for vacancy Announcement # 2003-HQ-2419 represented that she had performed all of the stated duties required for the position of Human Resources Specialist (Information Systems and Compensation), CG-201-11/12. *Compare* PX 2, Chappell-Johnson Application at 1-4, *with* PX 8, Vacancy Announcement # 2003-HQ-2419 (Human Resources Specialist (Information Systems and Compensation)), CG-0201-11/12 at 2; *see also*, PX 6 (Shirley Purnell Dep.) at 235-243 (testifying that she reviewed Chappell-Johnson's application/resume and agreeing that Chappell-Johnson's application/resume addressed the duties identified in the summary of duties in the vacancy announcement). In addressing the vacancy announcement's automated human resource information systems KSA ("3. Ability to conduct comprehensive analyses of automated human resource information systems."), Ms. Chappell-Johnson's application revealed that she had extensive experience working with a wide range of both internal FDIC and NFC automated personnel and payroll systems. PX 2, Chappell-Johnson Application, at 6-7. The Human Resources office of the FDIC

adjudged Ms. Chappell-Johnson to be qualified for the position, along with six other applicants.

**B.    The Other Top Two Applicants Were Far Less Qualified than Chappell-Johnson for the Human Resources Specialist (Information Systems and Compensation) Position.**

Although the FDIC has its own unique personnel and compensation policies, procedures

and regulations, a power granted to it by statute, PX 6 (Purnell Dep.) at 34, the other top two

applicants, both of whom were interviewed as part of the selection process and one of whom was

the ultimate selectee - - Ms. Patricia Quattrone and Ms. Coleista Salatich - - had no experience

with the FDIC personnel and pay systems nor with any of the FDIC payroll/personnel automation

systems, most notably CHRIS.   *See* PX 10 (Patricia Quattrone Application) (did not work

previously for the FDIC) and PX 11 (Coleista Salatich Application) (same).   Moreover, neither of

those applicants had ever served as a Payroll/Personnel Systems Specialist.   *See generally*, PX 10

and PX 11.   Yet, the duties expected to be performed in the vacant position were contained in

position descriptions that had been developed from FDIC Payroll/Personnel Systems Specialist

position descriptions.   *See* PX 9 (PD for the CG-11 (Human Resources Specialist (Information

Systems and Compensation)) had previously been the PD for a Payroll/Personnel Systems

Specialist, CG-301-9) and PX 12 (PD for the CG-12 (Human Resources Specialist (Information

Systems and Compensation)) had previously been the Supervisory Payroll/Personnel Systems

Specialist, CG-301-12).

In responding to the vacancy announcement's KSA #3 ("Ability to conduct

comprehensive analyses of automated human resource information systems"), Ms. Quattrone's

application indicated that she had "to research personnel and payroll processing issues utilizing

data from the National Finance Center," but her application does not address any experience or

work with Commerce Department or other governmental agency automated human resource

systems. PX 10 (Patricia Quattrone Application). Like Ms. Quattrone, Ms. Salatich's response to

the automated human resource information systems KSA also reflects that she had dealt with the

National Finance Center payroll/personnel system, but does not reflect any experience or work

with any other automated human resource systems, to include in any of the three governmental

agencies with which she had worked. PX 11 (Coleista Salatich Application). Therefore, in one

of the critical KSAs, neither of the other top two applicants had a level of experience comparable

to Ms. Chappell-Johnson, who had worked for years with both the NFC automated system and

the unique FDIC automated human resources systems.

     **C.**     **The Interview Panel.**

     Ms. Chappell-Johnson was interviewed for the position in mid-February 2004. The

interview panel consisted of Shirley Purnell, Eugene Bell, and Natalie Tyce. PX 5 (Purnell

Affidavit, dated December 15, 2004) at ¶ 18. Ms. Purnell was the selecting official, as well as

serving as the Assistant Director, HR Services Center - the office in which the individual selected

for the vacant position would work. PX 6 (Purnell Dep.) at 17-18.

**IV.**     **Discussions and Decisions Among the Interview Panel.**

     At the outset of the interview process, but before any interviews were conducted, Ms.

Purnell pulled out Ms. Quattrone's application and said, "I like this person, this is who I want."

PX 14 (Natalie Tyce Affidavit, dated November 18, 2004) at ¶ 9; *but see* PX 6 (Purnell Dep.) at

226-227 (no recall of saying that); PX 13 (Bell Dep.) at 82-83 (no recall of Purnell saying that).

According to Ms. Tyce, other than that comment by Ms. Purnell about Ms. Quattrone and her

application, there was no further discussion by the panel members about the applicants or the

applications before, during, or after the interview panel. PX 4 (Natalie Tyce Dep.) at 86-87

(testifying that there were no discussions about applicants by the interview panel members), PX 4

(Tyce Dep.) at 145 (testifying that Purnell told her that the panel "was not allowed to discuss the

candidate"), PX 4 (Tyce Dep.) at 141 (testifying that at the end of the interview process neither

she nor Mr. Bell told Purnell who their top two candidates were); *see also* PX 4 (Tyce Dep.) at

142-143 (testifying that she "started to make a comment" and Ms. Purnell "corrected [her] that

[the panel wasn't] supposed to talk about it or [they] could not talk about it"). *But see* PX 13

(Bell Dep.) at 64-66 (testifying that there was a discussion of each candidate at the end of each

applicant's interview and each panel member's ranking of applicants in order of number one

through three), 83-84 (the panel members discussed their individual ranking of candidates and

there was a consensus of the top person); DX, Eugene Bell Declaration, dated July 18, 2007, at ¶

9 ("At the conclusion of all of the interviews, Ms. Tyce and I identified our top candidate to Ms.

Purnell for her consideration."); PX 6 (Purnell Dep.) at 227-230 (testifying that the panel

discussed each applicant after each interview, that all three of the panel members discussed their

recommendations, and the three panel members came to a "consensus decision on who the top

two candidates were"); PX 6 (Purnell Dep.) at 286 (testifying that the panel came to a

"unanimous" consensus of the top two candidates and that she would be surprised to know that

Quattrone was not one of Tyce's top two candidates).

     Ms. Tyce testified that she did not have any conversations about Ms. Chappell-Johnson

with Ms. Purnell. PX 4 (Natalie Tyce Dep.) at 43 (no conversation with Purnell about Chappell-

Johnson since 2000). However, during her deposition, Ms. Purnell testified that during the

interview process Ms. Tyce told her that, when Chappell-Johnson worked for Ms. Tyce,

Chappell-Johnson's duties involved "time and attendance kinds of things." Specifically, Ms.

Purnell testified

> Q:   Did you hear any positive comments about Dorothy Chappell-Johnson
>      from Natalie Tyce?
> A:   Oh, yes.
> Q:   About?
> A:   We talked about the functions that she worked under Natalie's supervision
>      for, that they were co-workers. I remember - - most of what I remember is
>      time and attendance kinds of things.
> Q:   When did you have a conversation with Natalie Tyce about Dorothy
>      Chappell-Johnson's performance when Dorothy Chappell-Johnson and
>      Tyce were co-supervisors?
> A:   We talked about her performance when we did the discussion related to
>      the candidates that were being considered for the position, the grade 12
>      position, the H.R. specialist that has the payroll compensation duties.
> Q:   As part of the interview panel process?
> A:   As part of the discussion we had about the interview process, the
>      applications that we had, after we had interviewed the candidates.

PX 6 (Purnell Dep.) at 144-45.

## V.   Ms. Purnell Treated Ms. Chappell-Johnson Less Favorably than she Treated the Selectee - a Younger, White Female.

During the selection process, Ms. Purnell treated Ms. Chappell-Johnson markedly less

fair than she treated Patricia Quattrone, who was a younger, white female. Ms. Purnell was

dismissive of Chappell-Johnson's accomplishments and experience as reflected in Chappell-

Johnson's application/resume. Purnell testified that she did not believe that Chappell-Johnson

had performed the duties that were stated in her application/resume

> Q:   You would agree she addresses the issues that are in the Summary of
>      Duties, doesn't she?
> A:   In her application, she does reference those.
>
>           *           *           *           *
>
> Q:   It would seem her resume captured -

A:    It seems she covered that in her resume; yes.
Q:    Did you believe she did all these things she said she did?
A:    I had reason to question the level of detail of what she stated.

PX 6 (Purnell Dep.) at 241-43.  Later, Purnell testified

Q:    You didn't need to check her references to know that, did you?
A:    The information was in her application.
Q:    You didn't believe it, did you?  You had reason not to believe it, correct?
A:    That is what I stated earlier.

PX 6 (Purnell Dep.) at 304-305.  Indeed, in her affidavit provided during the EEO investigation,

Ms. Purnell stated that she was "not sure that [Chappell-Johnson] performed the full gamut of

duties and responsibilities described in the vacancy announcement."  PX 5 (Purnell Affidavit,

dated December 15, 2004) at ¶ 14.  Also during her deposition in response to a question whether

she believed the information that Chappell-Johnson had put in her application was true or not,

Purnell testified that employees "often put everything that's in their positions descriptions in their

applications . . . they don't always perform the full range of duties as described in their position

descriptions."  PX 6 (Purnell Dep.) at 308.  However, Ms. Purnell did not indicate any reluctance

to fully accept without reservation the contents of Ms. Quattrone's application.  Indeed, Purnell

testified that had she conducted a reference check with Chappell-Johnson's former supervisor(s)

(which Purnell did not do, PX 6 (Purnell Dep.) at 304), she would have verified the accuracy of

Ms. Chappell-Johnson's application/resume.  PX 6 (Purnell Dep.) at 308-309.  However, Ms.

Purnell chose not to inquire of Chappell-Johnson's former supervisor - Natalie Tyce - who was

also a member of the interview panel.  As such, Purnell deliberately chose not to verify Chappell-

Johnson's credentials.  But Purnell did conduct a reference check on the younger, white selectee -

Ms. Quattrone.

Ms. Purnell stated that she made her selection "after considering each of the candidate's [sic] applications and interview responses to the structured questions." DX, Shirley Purnell Declaration, dated July 19, 2007, at ¶¶ 5, 7. However, she only "fully considered" the applications of Ms. Quattrone and Ms. Salatich, but did not fully consider Ms. Chappell-Johnson's application. In addressing the manner in which she evaluated the candidates' responses to two of the five KSAs ("Ability to analyze, evaluate and make recommendations to senior level management officials" and "Ability to establish and maintain customer service and smooth working relationships with a variety of offices and individuals at all levels."), Purnell stated that "KSAs four and five were better evaluated through reference checks." PX 5 (Purnell Affidavit, dated December 15, 2004) at ¶ 8. Purnell testified that none of the structured interview questions addressed KSAs 4 or 5. PX 6 (Purnell Dep.) at 300. Purnell only conducted reference checks on the top two candidates. PX 6 (Purnell Dep.) at 301; *see also* PX 6 (Purnell Dep.) at 304 (did not do a reference check on Chappell-Johnson). Indeed, Purnell testified that she did not evaluate Chappell-Johnson against KSAs four and five during the selection process. PX 6 (Purnell Dep.) at 303. Therefore, of the top three candidates for the vacant CG-11/12 position of Human Resources Specialist (Information Systems and Compensation), including the selectee who was a younger white female, Ms. Chappell-Johnson was the only candidate whose application was deliberately not fully considered by Purnell.

## ARGUMENT

## I.    Summary Judgment Standards.

Summary judgment is proper only against "a party who fails to make a showing sufficient to establish the existence of any element essential to that party's case, and on which that party

- 14 -

will bear the burden of proof at trial." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 321 (1986). Accordingly, to make the determination on a motion for summary judgment, the court must evaluate all of the evidence before it. *Celotex*, 477 U.S. at 323. In *Anderson v. Liberty Lobby, Inc.*, the Supreme Court makes clear that disputes over facts, which might affect the outcome of the suit under the governing law, will preclude the entry of summary judgment. 477 U.S. 242, 248 (1986). Indeed, the evidence presented must always be construed in favor of the party opposing the motion for summary judgment, and it is that party who is also to be accorded the benefit of all favorable inferences that can be drawn from the record evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Washington Post Co. v. United States Dep't of Health and Human Srvs.*, 865 F.2d 320, 325 (D.C. Cir. 1989). Thus, the moving party must demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex,* 477 U.S. at 323. If, and only if, the moving party meets this burden, the burden passes to the nonmoving party to establish the existence of a disputed factual element essential to his case with respect to which he bears the burden of proof. *Id.* Where the record taken as a whole could lead a rational trier of fact to find for the nonmoving party, the motion for summary judgment cannot be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In Title VII cases, the D.C. Circuit has directed that courts view summary judgment with special caution because these cases involve issues of discriminatory motive and intent. *See Aka v. Washington Hosp. Ctr*, 116 F.3d 876, 879 (D.C. Cir. 1997) ("because employment discrimination claims center on the issue of an employer's intent, and 'writings directly supporting a claim of intentional discrimination are rarely, if ever, found among an employer's

corporate papers,' an added measure of 'rigor,' or 'cautio[n], is appropriate in applying this

standard to motions for summary judgment in employment discrimination cases") (internal

citations omitted); *Albritton v. Kantor*, 944 F. Supp. 966, 970 (D.D.C. 1996) ("because

discriminatory intent and proof of disparate treatment are difficult to establish, courts must view

summary judgment with special caution and therefore must be particularly careful to view all of

the evidence in the light most favorable to the plaintiff"); *Ross v. Runyon*, 859 F. Supp. 15, 21-22

(D.D.C. 1994) (recognizing that discriminatory intent and proof of disparate treatment are

notoriously difficult to establish, so the court must be extra-careful to view all evidence in the

light most favorable to the plaintiff); *Johnson v. Digital Equip. Corp.*, 836 F. Supp. 14, 18

(D.D.C. 1993) (same).  Accordingly, if a reasonable fact-finder could infer discrimination based

on the evidence submitted, then summary judgment is inappropriate.  *See Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. at 248 (Summary judgment cannot be granted "if the evidence is such that

a reasonable jury could return a verdict for the non-moving party."); *Albritton*, 944 F. Supp. at

970 (summary judgment not appropriate "[i]f a reasonable fact finder could infer discrimination

based on the evidence submitted"); *Hayes v. Shalala*, 902 F. Supp. 259, 264 (D.D.C.

1995)(same).  Therefore, the trial court's focus must be whether a genuine issue exists as to

whether the defendant intentionally discriminated against the plaintiff.  *St. Mary's Honor Center*

*v. Hicks*, 509 U.S. 502, 507 (1993) ("'[T]he defendant must clearly set forth, through the

introduction of admissible evidence,' reasons for its actions which, *if believed by the trier of fact,*

would support a finding that unlawful discrimination was not the cause of the employment

action.") (emphasis in original) (internal citations omitted); *Barbour v. Merrill*, 48 F.3d 1270,

1276 (D.C. Cir. 1995) ("plaintiff need only establish a prima facie case and introduce evidence

sufficient to discredit the defendant's proffered nondiscriminatory reasons; at that point, the

factfinder, if so persuaded, may infer discrimination").

## II.     Chappell-Johnson Has Established a *Prima Facie* Case of Race and Age Discrimination.

Title VII of the Civil Rights Act of 1964, makes it unlawful for the federal government to

discriminate in employment on the basis of sex or race. 42 U.S.C. § 2000e-16. In considering

discrimination and retaliation cases, Courts often employ the familiar burden-shifting framework

of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, (1973). *See Brown v. Brody,* 199

F.3d 446 (D.C.Cir.1999) (*McDonnell Douglas* test applies to federal employees' Title VII

claims). To establish a *prima facie* case of discrimination, the plaintiff must show that: (1) she

is a member of a protected class; (2) she suffered an adverse employment action; and (3) the

unfavorable action gives rise to an inference of discrimination. *Stella v. Mineta*, 284 F.3d 135,

145 (D.C. Cir. 2002); *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999). The burden of

establishing a *prima facie* case "is not onerous." *Texas Dept. of Community Affairs v. Burdine,*

450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

Defendant concedes that Ms. Chappell-Johnson satisfies this burden as she (1) is a black

female, (2) applied, and was deemed qualified, for the positions in question, and (3) the FDIC

filled the vacancy at issue with a person outside of her protected class. *See* Defendant's

Memorandum in Support of Motion for Summary Judgment ("Def. Mot.) at 12-13.

## III.    Chappell-Johnson Has Established a *Prima Facie* Case of Unlawful Retaliation.

To establish a *prima facie* case of unlawful retaliation a plaintiff must show that: (1) she

engaged in statutorily protected activity; (2) her employer took an adverse personnel action

against her; and (3) a causal connection exists between the two. *Carney v. The American University*, 151 F.3d 1090, 1095 (D.C. Cir 1998); *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985). "As in a case of disparate treatment, this initial burden is not great. Plaintiff merely needs to establish facts adequate to permit an inference of retaliatory motive." *McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C. Cir. 1984). Thus, to prove the third element, a plaintiff may produce evidence sufficient to show that the adverse action closely followed the protected activity. *Gleklen v. Democratic Congressional Campaign Committee*, 199 F.3d 1365, 1368 (D.C. Cir. 2000) ("Temporal proximity is often found sufficient to establish the requisite causal connection for [retaliation] claims.").

Although defendant attempts to do so, it cannot dispute the fact that Ms. Chappell-Johnson satisfies this burden as she (1) engaged in statutorily protected activity, in that she has a history of filing EEO complaints at the FDIC, and she had at least one ongoing discrimination lawsuit against the defendant at the time the selection was made; (2) her employer took an adverse personnel action against her by denying her promotion; and (3) based upon the facts that Ms. Chappell-Johnson had pending EEO complaints at the time the selection was made, a reasonable fact-finder could infer a causal connection based upon the temporal proximity alone. Defendant contends that Chappell-Johnson cannot establish a causal connection between her prior EEO activity, Purnell's knowledge of and involvement in her EEO complaints, and Chappell-Johnson's non-selection. However, at the time of the selection, Ms. Purnell was aware of Chappell-Johnson's ongoing prior EEO activity. PX 5 (Purnell Affidavit, dated December 15, 2004) at ¶ 18. Ms. Purnell testified that she was personally involved in calculating pay/salary data as part of a settlement offer by the agency in an ongoing EEO complaint. PX 6 (Purnell

- 18 -

Dep.) at 173-74. Ms. Purnell had signed out Chappell-Johnson's Official Personnel Folder during the exact time period when Purnell was not selecting Chappell-Johnson for the position at issue in this lawsuit. PX 1 (Chappell-Johnson Affidavit, dated November 12, 2004) at ¶ 6. There is evidence upon which a reasonable jury could infer a causal connection based upon the temporal proximity in the circumstances of this case. A jury could infer that Purnell was fully aware of and involved in Chappell-Johnson's previous EEO complaints and reject defendant's claim that retaliation was not a reason for Ms. Purnell not selecting Chappell-Johnson. Therefore, defendant's motion for summary judgment must be denied.

## IV. A Reasonable Jury Could Reject the Reasons Proffered by FDIC for its Non-Selection of Ms. Chappell-Johnson As Pretextual.

Once the plaintiff has established a *prima facie* case, the burden shifts to the defendant to produce evidence that the plaintiff was rejected for a legitimate, nondiscriminatory reason. *Reeves v. Sanderson Plumbing*, 530 U.S. 133, 142 (2000); *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003). As the Federal Deposit Insurance Corporation has offered a nondiscriminatory explanation for its actions - - its claim that the selectee was the best qualified candidate, the sole remaining issue is discrimination or retaliation "vel non." *Reeves*, 530 U.S. at 142-43. Ms. Chappell-Johnson, therefore, may meet her burden of establishing pretext and survive judgment as a matter of law by showing that the employer's proffered reason was not the real reason for the employer's action. *Aka v. Washington Hospital Center*, 156 F.3d 1284 (D.C. Cir. 1998) (*en banc*). At this point, "to survive summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason [or retaliatory]." *Holcomb v. Powell*, 433 F.3d 889, 896-

897 (D.C. Cir. 2006) (*quoting Lathram*, 336 F.3d at 1088). In this context, "all of the evidence"

means any combination of: (1) evidence establishing the plaintiff's *prima facie* case; (2)

evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and

(3) any further evidence of discrimination that may be available to the plaintiff, such as

independent evidence of discriminatory statements or attitudes on the part of the employer.

*Holcomb*, 433 F.3d at 897 *citing Aka*, 156 F.3d at 1289.

This Circuit established that "[u]sually, proffering 'evidence from which a jury could find

that [the employer's's stated reasons. . .were pretextual. . .will be enough to get a plaintiff's claim

to a jury.'" *George v. Leavitt*, 407 F.3d 405 (D.C. Cir. 2005). Thus, plaintiff's evidence must be

viewed in the light most favorable to Chappell-Johnson to determine whether the jury could

reject Purnell's claim that Quattrone was the best qualified candidate and therefore infer

discrimination and/or retaliation.

A reasonable juror could reject the FDIC's claim that Quattrone was the best qualified

candidate. At the time of the selections Chappell-Johnson had more than six years of experience

performing the very duties that were required in the position at issue here, and she extensive

experience dealing with the organizational-unique policies and procedures, as well as with both

the NFC and FDIC human resources/payroll automation systems. The selectee - Quattrone -

lacked any experience with FDIC personnel and payroll matters and her experience with

automation was limited to obtaining information from NFC systems. *Compare* PX 2, Chappell-

Johnson Application *with* PX 10 (Quattrone Application). Indeed, there is irrefutable evidence

that Chappell-Johnson had successfully performed the duties of the position in prior assignments

with FDIC. *See* PX 2, Chappell-Johnson Application at 2-4; PX 3; PX 4, (Natalie Tyce Dep.) at

28 (rated Chappell-Johnson at no less than "successful" level); PX 6 (Purnell Dep.) at 178-190

(agreeing that the position description for the former position, CG-9, Payroll/Personnel System

Specialist, and the Summary of Duties in Vacancy Announcement # 2003-HQ-2419, are very

similar and contain a lot of the same language); *see also*, PX 6 (Purnell Dep.) at 235-243

(testifying that she reviewed Chappell-Johnson's application/resume and agreeing that it

addressed the duties identified in the summary of duties in the vacancy announcement).

There is also evidence that Purnell chose to dismiss Chappell-Johnson's outstanding

credentials instead of taking the necessary step of verifying the accuracy of Chappell-Johnson's

application/resume by inquiring of her former supervisor. PX 6 (Purnell Dep.) at 241-43 (did not

believe Chappell-Johnson had performed the duties described in her application/resume), 304-

305 (same), 308, 308-309; *see also* PX 5 (Purnell Affidavit, dated December 15, 2004) at ¶ 14

("not sure that [Chappell-Johnson] performed the full gamut of duties and responsibilities

described in the vacancy announcement"). Purnell did check Quattrone's references, but not

Chappell-Johnson's. Moreover, Purnell did not question the representations of the other

candidates in their applications. As such, a jury could infer that the Purnell ignored Chappell-

Johnson's numerous attributes, and that the FDIC's professed claim that Quattrone was the best

qualified candidate is mere pretext.

Ms. Purnell testified she did not evaluate Chappell-Johnson against KSAs four and five

during the selection process. PX 6 (Purnell Dep.) at 303. Ms. Chappell-Johnson was the only

candidate whose application was deliberately not fully considered by Purnell. As such, Purnell

treated Chappell- Johnson less favorably than the younger, white female selectee. Therefore,

there is ample evidence to allow a jury to reject the FDIC's contention that it selected Ms.

- 21 -

Quattrone because she was the best qualified candidate.

Moreover, "[c]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are jury functions, not those of the judge." *Reeves*, 530 U.S. at 150-51. At summary judgment, the trial court "must disregard evidence the jury is not required to believe" and credit evidence of the movant that is uncontradicted and unimpeached only "to the extent that the evidence comes from disinterested witnesses." *Id.* Only a jury can resolve the disputed issues of fact raised by this record, *e.g.*,

o       Ms. Tyce stated that Purnell started the interview panel process by declaring that Ms. Quattrone was the selectee that she wanted (despite Purnell testifying that she reviewed Chappell-Johnson's application and noted that Chappell-Johnson had performed all the duties required of the vacant position) - but Purnell denied making this statement;

o       Ms. Tyce testified that the interview panel did not, at any time, discuss the interviews, the interview results, or any individual preferences by the panel members - but Purnell contends that the panel discussed the applicants and interview results and that the panel came to a unanimous consensus of the two top candidates; and

o       Ms. Tyce testified that since 2000, she has not had a conversation with Purnell about Chappell-Johnson - but Purnell contends that during the interview panel process Tyce told Purnell that Chappell-Johnson's duties during 1992-1996 consisted mainly of time and attendance matters.

In *Aka*, 156 F.3d at 1294, the Court of Appeals held that a review of the applicant's relevant qualification is appropriate to determine if ". . .the fact finder can legitimately infer that the employer consciously selected a less-qualified candidate. . ." The Court goes on to state that

a "reasonable juror would [not] in every case defer to the employer's assessment. If that were so, no job discrimination case could ever go to trial." *Id.* Notwithstanding this holding, the FDIC asserts that a plaintiff cannot show "that <u>any</u> of the three panel members bore any animus, prejudice or negativity toward Plaintiff"[1] and that "there is no allegation, let above [sic] evidence, that . . . Shirley Purnell, demonstrated any animus, racial, age-related, or retaliatory, during the interview process." Def. Mot. at 15. These arguments have no merit. In effect, defendant is asking the Court to apply the so-called "pretext plus," which has been soundly rejected both by the D.C. Circuit and the Supreme Court. *See Aka*, 156 F.3d at 1292; *Reeves*, 530 U.S. at 146-147. Evidence which proves that the employer's explanations for its actions are false supports an inference of discrimination or retaliation. Under *Aka* and *Reeves*, Chappell-Johnson's evidence that Ms. Quattrone did not satisfy the human resources automation systems requirements for the position (while Chappell-Johnson had demonstrated extensive experience with the NFC <u>and</u> FDIC's human resources automation systems), the fact that Ms. Purnell chose to dismiss Ms. Chappell-Johnson's credentials as stated in her application while accepting Ms. Quattrone's assertions without question, the fact that Purnell did not check Chappell-Johnson's references (while checking the selectee's references) while acknowledging that such a reference check would have verified the information in Chappell-Johnson's application, and the fact that Purnell

---

[1] In the first place, Shirley Purnell was the selecting official in this matter, not the other two members of the interview panel. Secondly, as Ms. Tyce has testified, the interview panel did not discuss the relative qualifications or success during the interviews at any time. Moreover, Ms.Tyce testified that neither she nor Eugene Bell were allowed to discuss their individual rankings of the candidates with Purnell at any time before, during, or after the interview panel. Finally, it was Shirley Purnell who made the decision not to check Ms. Chappell-Johnson's references, which by Purnell's own admission would have verified the accuracy of Chappell-Johnson's application.

did not even fully consider Chappell-Johnson's qualifications regarding two of the five KSAs (while checking two other applicants), if credited by the jury, is sufficient to support an inference that the reasons advanced by the FDIC for its actions are a pretext to cover discriminatory or retaliatory reasons for not selecting Chappell-Johnson.

## CONCLUSION

Based upon the foregoing, plaintiff respectfully submits that defendant's motion for summary judgment must be denied and that her case should proceed to a resolution on the merits of her claims.

Respectfully submitted,

_____/s/_____

David H. Shapiro, D.C. Bar # 961326
James E. Simpson, D.C. Bar # 482870
SWICK & SHAPIRO, P.C.
1225 Eye Street, N.W.
Suite 1290
Washington, D.C.  20005
Tel. (202) 842-0300
FAX  (202) 842-1418

Attorneys for Plaintiff