# PLAINTIFF'S EXHIBIT 6

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

ORIGINAL

- - - - - - - - - - - - - - - - -X

DOROTHY CHAPPELL-JOHNSON,        :

        Plaintiff        :

   v.                  : Civil Action No.

                      : 06-0314 (RCL)

MARTIN J. GRUENBERG, VICE CHAIRMAN :

 FEDERAL DEPOSIT INSURANCE     :

 CORPORATION             :

        Defendant.      :

- - - - - - - - - - - - - - - - -X

Washington, D.C., Monday, May 14, 2007

Deposition of

SHIRLEY Y. PURNELL

a witness of lawful age, taken on behalf of the

Plaintiff, in the above-entitled action, before

KENYAN C. HOPCHAS, Notary Public in and for the

District of Columbia, in the offices of Swick &

Shapiro, 1225 Eye Street, N.W., Suite 1290,

Washington, D.C., commencing at 10:08 a.m.
 Diversified Reporting Services, Inc. (202) 467-9200

Appearances:


On behalf of the Plaintiff:

JAMES E. SIMPSON, ESQ.

Swick & Shapiro, P.C.

1225 Eye Street, N.W., Suite 1290

Washington, D.C.  20005

(202) 842-0300


On behalf of the Federal Deposit

Insurance Corporation:

WILLIAM S. JONES, ESQ.

Legal Division

Corporate Operations Branch


Federal Deposit Insurance Corporation


3501 Fairfax Drive, Room E-6006


Arlington, Virginia  22226


(703) 562-2362

1    Q    At that time, was the Human Resources

2    Service Center part of the Human Resources Branch?

3    A    Yes, part of the Human Resources Services

4    Branch.

5    Q    By the way, when you were selected for the

6    assistant director, H.R. Services Center in January

7    2004, who was your immediate supervisor when you were

8    selected for that position?

9    A    Miguel Torrado.  The reason I'm saying

10    Torrado, Carolyn Jordan-Smith had retired and they

11    did not replace Carolyn Jordan-Smith immediately.

12    Q    Did you act in that capacity before you

13    were selected?

14    A    Yes, I did.

15    Q    When did you begin service in the acting

16    position?

17    A    My recollection is that Carolyn Jordan-

18    Smith retired in about March of 2003.  I think I

19    served as acting for approximately five/six months.

20    Q    Did someone else serve as the acting

21    assistant director?

22    A    I don't remember anyone else acting in that

1    capacity.

2        Q    She retired in approximately March of 2003

3    and you were selected in January of 2004.  That would

4    have been about nine months.

5        A    I don't remember serving longer than about

6    four to six months in the acting capacity.

7        Q    Do you recall whether you replaced Ms.

8    Jordan-Smith immediately in an acting capacity?

9        A    I don't believe I was given official acting

10   capacity until that last six months or so.

11       Q    You believe you assumed the acting capacity

12   of the assistant director in the early Summer of

13   2003?

14       A    That's probably about right.

15       Q    You don't recall who served as the acting

16   assistant director prior to your assuming that?

17       A    I don't remember anyone else serving in

18   that capacity.

19       Q    Actually, beginning some time in the early

20   Summer of 2003 when you were the acting assistant

21   director, you reported to Miguel Torrado; correct?

22       A    Yes.

1    and Compensation.

2         Q    In the early Summer of 2003, Mr. Bell was

3    the head of Staffing and Compensation?

4         A    2003.  When he came on board, he was head

5    of the Staffing and Compensation group.

6         Q    Do you remember when he came on board?

7         A    He wasn't a manager when he first came on

8    board.  I think he was not in a supervisory position,

9    so he would have been the lead person in that

10    organization.

11        Q    Initially, when he came to the Human

12    Resources Services Center, he was not a supervisor?

13        A    I'm trying to think.

14        Q    Do you recall whether it was a supervisory

15    position initially?

16        A    I don't.

17        Q    Do you recall when he came on board?

18        A    He came to work in 1973.  I don't remember

19    the exact month or date.

20        Q    In 1973?

21        A    Yes.  Excuse me, 2003.

22        Q    Did you select Mr. Bell for that position?

1      A    Yes.

2      **Q    When you selected Mr. Bell, were you the**

3 **acting H.R. Services Center assistant director?**

4      A    I don't know if I was acting or whether --

5 yes, I would have had to be acting at this point.  I

6 didn't get the selection until 2004.

7      **Q    Do you remember what grade Mr. Bell was**

8 **selected for when you selected him?**

9      A    Selected as a 14.

10     **Q    Would that be a CG-14?**

11     A    Yes.

12     **Q    Was there an interview panel held for that**

13 **selection?**

14     A    Yes.

15     **Q    Who served on the interview panel?**

16     A    I'm not sure.

17     **Q    Did you serve on the interview panel?**

18     A    Yes.

19     **Q    And you were the selecting official;**

20 **correct?**

21     A    Yes.

22     **Q    You don't remember other members of that**

Page 144

1    A    (Nodding head.)

2    Q    **Did you have anything favorable or positive**

3    **from Miguel Torrado about Dorothy?**

4    A    I don't know that I had any detailed

5    conversation with Miguel about Dorothy.

6    Q    **What about Natalie Tyce?**

7    MR. JONES:  Objection; hearsay.  You can

8    answer.

9    THE WITNESS:  I don't know what the

10    question is.

11    BY MR. SIMPSON:

12    Q    **Did you hear any positive comments about**

13    **Dorothy Chappell-Johnson from Natalie Tyce?**

14    A    Oh, yes.

15    Q    **About?**

16    A    We talked about the functions that she

17    worked under Natalie's supervision for, that they

18    were co-workers.  I remember -- most of what I

19    remember is time and attendance kinds of things.

20    Q    **When did you have a conversation with**

21    **Natalie Tyce about Dorothy Chappell-Johnson's**

22    **performance when Dorothy Chappell-Johnson and Tyce**

1  were co-supervisors?

2      A    We talked about her performance when we did

3  the discussion related to the candidates that were

4  being considered for the position, the grade 12

5  position, the H.R. specialist that has the payroll

6  compensation duties.

7      Q    As part of the interview panel process?

8      A    As part of the discussion we had about the

9  interview process, the applications that we had,

10 after we had interviewed the candidates.

11     Q    When Dorothy Chappell-Johnson reported to

12 you directly some time in the 2003 time period for

13 about four months, did you have the occasion to

14 render a performance appraisal on her?

15     A    Yes.

16     Q    Do you recall how you rated her?

17     A    I remember receiving input from her prior

18 supervisor, which was David Harrington.  I don't

19 remember it being exceptional.

20     Q    You don't recall it being exceptional.  Do

21 you recall it being better than successful?

22     A    I know it was at least successful.  I don't

Page 173

1    A    Yes.  I remember a discussion with Miguel.

2    **Q    Where did that discussion take place?**

3    A    In Miguel's office.

4    **Q    Did that discussion include specific**

5    **settlement figures, calculations for settlement?**

6    A    Yes.

7    **Q    Who did those?**

8    A    My recollection is that Natalie prepared

9    the calculations.

10   **Q    Was Natalie with you when you met with**

11   **Miguel Torrado?**

12   A    Actually, it was not Natalie.

13   **Q    You prepared the calculations, didn't you?**

14   A    I may have prepared the calculations

15   because it involved an H.R. employee.  Typically,

16   when H.R. employees are involved, we try not to let

17   other employees in the organization know.

18   **Q    It was standard practice, wasn't it?**

19   A    Right.

20   **Q    For any settlement calculations involving**

21   **certainly someone in the H.R. Branch, you would work**

22   **those when you were the Operations' assistant**

Page 174

1    director; correct?

2        A    I would have been involved.  I remember

3    specifically that I was involved in the calculations

4    for Dorothy.  I can't say that was the case for every

5    employee in the H.R. Branch that a settlement was

6    done.

7        Q    **Did Miguel Torrado specifically ask you to**

8    **do those calculations in Dorothy Chappell-Johnson's**

9    **matter?**

10       A    I believe he did.

11       Q    **You had more than one discussion with**

12   **Miguel Torrado about possible settlement and**

13   **settlement calculations in a prior EEO case of**

14   **Dorothy Chappell-Johnson, didn't you?**

15       A    Yes.  I met with him to get the assignment.

16    I remember meeting with him to provide him data, and

17   then I met with him, as I recall, a third time for a

18   discussion.

19       Q    **What did you discuss the third time?**

20       A    The third time, initially the discussion I

21   had with Miguel related to a reassignment of Dorothy

22   to the Benefits organization.  The issue there was

Page 175

1    Saved Pay, because the position was a lower grade.

2    After the calculations were made, after I think

3    Miguel had talked to Dorothy, then the decision was

4    made to make it a RIF action instead of a

5    reassignment because the employee would benefit more

6    from a RIF action than they would from the

7    reassignment.

8        **Q    That was all tied to settlement discussion**

9    **calculations; correct?**

10        A    Right.

11        **Q    Do you remember the time frame?**

12        A    No.

13        **Q    2003?**

14        A    That was my original recollection about the

15    time that we were down sizing, so that sounds

16    reasonable.

17        **Q    It had to do with settlement of an EEO**

18    **complaint, didn't it?**

19        A    Yes.

20        **Q    That complaint was actually in Federal**

21    **Court at that time, wasn't it?**

22        A    I don't recall.

1      **Q     What do you remember Miguel Torrado telling**

2  **you about it?**

3      A    What I remember Miguel asking for was to

4  calculate costs.  Let me see if I can remember any

5  more of the details.  That's what I remember the

6  discussion being.  What I was asked to do was to look

7  at the difference between doing an action as Saved

8  Pay or doing it as a RIF action.

9           My basic recollection is that under the RIF

10  action, the employee benefitted better than they did

11  under the Saved Pay provisions.

12     **Q     It was clearly your understanding that had**

13  **to do with an EEO complaint that Dorothy Chappell-**

14  **Johnson had filed?**

15     A    Yes.

16     **Q     Do you recall who was filing it?**

17     A    No.

18     **Q     Do you recall what it involved?**

19     A    No.

20     **Q     A non-selection?**

21     A    I don't remember.

22     **Q     Do you recall that after a meeting with**

1          (Witness reviewing document.)

2          BY MR. SIMPSON:

3     Q     Have you seen this before?

4     A     Yes.

5     Q     Were you involved in the approval process

6  for this PD?

7     A     I think this is when Carolyn was still

8  there.  When Carolyn Jordan-Smith had these position

9  descriptions re-done, I was involved; yes.

10    Q     Do you recall on page one up at the top,

11 area 4B, "Other," where it says "Previously, this

12 position was a payroll/personnel systems specialist,

13 CG-0301-09?"  Block 4B.  Did I read that right?

14    A     Yes.

15    Q     Did you have in the Operations Section

16 payroll/personnel systems specialist, CG-0301-09,

17 that worked for you?

18    A     Donna Saranno was a nine.

19    Q     So, you did; correct?

20    A     Yes.

21    Q     As I understand this particular position

22 description, this is now being classified as an H.R.

1    specialist, Information Systems and Compensation, CG-

2    11, with a career series 201; correct?

3        A    That's correct.

4        Q    You would have been involved in the changes

5    from a CG-0301-09 position that worked for you in the

6    form of Donna Saranno to the development of this

7    position description; correct?

8        A    Yes.

9        Q    By the way, do you know whose initials

10    those are, "B.H.," right beside the CG-0201-11?  The

11    date, 11/27/02?  Do you know what office that person

12    would have been in?  Part of Operations; correct?

13        A    It could have been Operations but it could

14    have been the Compensation group.  If I remember

15    correctly, Dave Harrington was involved in the re-

16    write of the position descriptions.  The reason the

17    series changed from 301 to 201 is because OPM changed

18    the H.R. series, the 201, that encompassed the duties

19    of the payroll and personnel functions.

20        Q    Do you know whose initials "B.H." are?

21        A    I don't know.  That's what I was looking

22    at, to see if it was Dave Harrington.  I'm trying to

1    think if there was anybody else around that had

2    "B.H."

3         Q    Look at Section 13, the signature right

4    under Carolyn Jordan-Smith, do you know whose

5    signature that is?

6              I'm sorry.  You're nodding your head.

7         A    No, I don't know whose signature that is.

8         Q    In Block 8C where it is talking about

9    organizational location, it says "Third Subdivision,

10   Operations."  That's your office; correct?

11        A    Right.  That would have been Operations.

12        Q    In November of 2002, you would have been

13   the assistant director for the Operations element for

14   a little over three years; correct?

15        A    Yes.

16        Q    Turning to page two of Exhibit 4, where it

17   says "Introduction."  It says "Serves as

18   troubleshooter" and "Super users" of "Human Resources

19   H.R. automated systems with responsibility for

20   performing a variety of professional and technical

21   duties in connection with the full range of

22   transactions relating to compensation."

Page 181

1          I read that correctly?

2     A    Yes.

3     Q    Do you know if that "Introduction" was

4 contained in the previous PD for the

5 payroll/personnel systems specialist, 09?

6     A    No, I don't have that kind of recall about

7 what was in the nine PD.

8     Q    You would agree that this is going from a

9 CG-09 level, payroll/personnel systems specialist to

10 a CG-11; correct?

11    A    Yes.

12    Q    If I read through the major duties,

13 Information Systems Administration, on page two,

14 talks about CHRIS.  In the first bullet, it talks

15 about CHRIS and processing issues with the National

16 Finance Center and its systems; correct?

17    A    Yes.

18    Q    That is pretty much captured in the Summary

19 of  Duties for the Vacancy Announcement that is at

20 Exhibit 3, isn't it?  In fact, that kind of coincides

21 with the first sentence and the second sentence and

22 the third sentence; doesn't it?

1      A    The sentence in the Vacancy Announcement

2   talks about troubleshooting assignments involving

3   most difficult and sensitive issues.  It doesn't go

4   so far as to say that those issues are compensation

5   related.  It talks about payroll and --

6      Q    **The first bullet in the major duties of the**

7   **PD for the CG-11 says "Investigates, troubleshoot and**

8   **response to a variety of recurring and complex**

9   **inquiries regarding payroll and personnel matters."**

10     A    Yes.

11     Q    **That reads fairly close to the first**

12  **sentence, doesn't it, of the Summary of Duties?**

13     A    Fairly close; yes.

14     Q    **In that first bullet of the position**

15  **description, it talks about CHRIS, which is the**

16  **second sentence of the Summary of Duties; correct?**

17     A    The second sentence talks about CHRIS?

18     Q    **In the Summary of Duties; correct?**

19     A    Yes, it does talk about CHRIS.

20     Q    **In fact, in the first bullet of the PD for**

21  **a CG-11, it says "Serves as an expert resource and**

22  **authority on NFC and CHRIS processing and provides**

Page 183

1    information and guidance to support the staff."  That

2    is pretty much captured again, in the second sentence

3    of the Summary of Duties?

4        A    Uh-huh; yes.

5        Q    The last sentence "Participates in the

6    testing and implementation of system modifications

7    and changes."  What is your understanding of that

8    sentence with respect to the paragraph?

9        A    "Participates in the testing and

10    implementation of system modifications and changes."

11    That would be the kinds of duties that I described

12    as user acceptance.

13        Q    What "system?"

14        A    CHRIS.

15        Q    And NFC, too; right?

16        A    Yes.  It could be NFC; yes.

17        Q    Again, that's kind of captured in the third

18    sentence of the Summary of Duties as well?

19        A    Yes.

20        Q    The third bullet at the bottom of the PD,

21    that kind of captures the interface between CHRIS and

22    NFC and reports that are generated and audits;

Page 184

1    correct?

2        A    Yes.

3        Q    On page three of the PD, under

4    "Compensation Program Administration," the first

5    bullet, "Investigates and responds to a variety of

6    questions and problems raised by employees and

7    administrative personnel involving compensation and

8    payroll matters, makes complex pay calculations and

9    resolves technical discrepancies that arise in

10   connection with personnel and payroll processing."

11           Have I read that correctly?

12       A    Yes, you did.

13       Q    That dove tails very well with information

14   in the Summary of Duties for the CG-201-11 human

15   resources specialist, Information Systems and

16   Compensation, doesn't it?

17       A    Are you talking --

18       Q    Under Summary of Duties; yes, ma'am.

19       A    Under GS-11?

20       Q    No, under Summary of Duties.  If you look

21   at the sentence that begins with "Responds to

22   inquiries from employees, management officials and

1   others concerning H.R. systems and compensation

2   related issues."

3        A    It's similar.

4        Q    Very similar, isn't it?

5        A    It's similar.

6        Q    Contains a lot of the same language,

7   doesn't it?

8        A    Yes.

9        Q    Of course, in the Summary of Duties, on

10  Exhibit 2, "Reviews and approves salary advances and

11  authorizes payments," up to the point it talks about

12  retroactive payments resulting from lawsuits and

13  discrimination complaints, but the first part of that

14  sentence "Reviews and approves salary advances and

15  authorizes payments for corrections to NFC system

16  errors," is that kind of the same thing as the second

17  bullet under "Compensation Program?"

18        MR. JONES:  I'm sorry.  I think you said

19  Exhibit 2 and you mean to say Exhibit 3.

20        BY MR. SIMPSON:

21        Q    Part of that sentence in Exhibit 2 and the

22  second bullet in Exhibit 3 on page three.

Page 186

1          MR. JONES:  It is actually Exhibit 3.

2          MR. SIMPSON:  I'm sorry.  Exhibit 3 and

3    Exhibit 4.

4          THE WITNESS:  The sentences are similar;

5    yes.

6          BY MR. SIMPSON:

7     Q    **Very similar, aren't they?**

8     A    Yes.

9     Q    **In fact, the next several bullets on that**

10   **page of  Exhibit 4, "Serves as a Washington contact**

11   **representative with NFC, discuss and resolve day to**

12   **day problems and activities, coordinates resolution,**

13   **advises senior management, recommends system**

14   **changes."**

15        **The next bullet "Coordinates and processes**

16   **waiver for overpayments, technical assistance and**

17   **guidance to staff members."**

18        **The next bullet "Maintains records of**

19   **payments."**

20        **That is all encompassed -- those duties are**

21   **all encompassed in the Summary of Duties as well,**

22   **aren't they?**

Page 187

1       A     Yes.

2       Q     Going to the next page, five -- page four

3    of the PD, the next to last bullet "Serves as the

4    unemployment compensation program coordinator."  It

5    is right above "Knowledge Required by the position."

6     It is the second bullet up.

7       A     Uh-huh.

8       Q     Does that mean that any CG-201-11, human

9    resources specialist, Information Systems and

10   Compensation, should be able to perform that, if it's

11   required in the PD?

12      A     If it's required in the PD -- let me see.

13   If it's required in the PD, the person should be able

14   to perform that responsibility.

15      Q     Again, this is a transition from a CG-9,

16   formerly a payroll/personnel systems specialist, to

17   now a CG-11, H.R. specialist, Information Systems and

18   Compensation.

19          If this position description for an 11,

20   H.R. specialist, Information Systems and

21   Compensation, was previously designated as a CG-9,

22   payroll/personnel systems specialist, would you have

1    an expectation of someone who served as a CG-11

2    payroll/personnel systems specialist would be

3    responsible to do the same things that a CG-9 would

4    do only more?

5        A    The grade 11 should have higher level

6    duties than the grade nine.

7        Q    And the full range of duties that are

8    listed in this PD, what used to be a CG-9; correct?

9        A    I have not seen the nine PD, but they said

10   this was an outgrowth of the nine PD.  It does not

11   mean that there aren't some duties in this position

12   that are higher level than the jobs that existed in

13   the nine.

14       Q    This particular position used to function

15   as a CG-9; didn't it?  That is now being classified

16   as a CG-11?  Isn't that what this tells me?

17       A    It tells you that the forerunner to this

18   position was a grade nine.

19       Q    That's right.  If a nine was performing the

20   duties in the position description for the

21   payroll/personnel systems specialist, 09, would that

22   person do an 11 here, as contained in this PD?

Page 189

1     A     We're not doing a side by side comparison

2     of what the nine --

3     **Q     I'm asking you, could a nine perform the**

4     **duties that are listed here for an 11 on the current**

5     **PD?**

6          MR. JONES:  Objection; calls for

7     speculation.

8          BY MR. SIMPSON:

9     **Q     You had CG-9 payroll/personnel systems**

10    **specialists work for you; correct?**

11    A     Yes, I did.  One of the things that is my

12    recollection, the time frames run together, it's

13    difficult to keep all the time frames in my head, but

14    one of the things that I remember is the person who

15    did a lot of the nine duties was promoted to an 11,

16    and after they were promoted to an 11, they didn't

17    stay long after they were promoted to the grade 11.

18    **Q     What do you mean "they didn't stay long?"**

19    **They went somewhere else?**

20    A     If this is the PD I think it is, if this is

21    the Donna Saranno PD, Donna Saranno retired shortly

22    after.

Page 190

1     Q    She was selected to fill that position,

2  wasn't she?

3     A    Right.

4     Q    Who selected her?

5     A    I certainly would have been involved as the

6  approving official or the actual selectee.

7     Q    But you don't recall specifically, do you,

8  whether you selected her or approved her selection?

9     A    I don't recall.

10    Q    She was selected to serve as a CG-201-11;

11 correct?

12    A    Yes.

13    Q    It was decided she could perform the duties

14 and the functions as a CG-11; correct?

15    A    Right.

16    Q    She had been doing the nine work prior to

17 that?

18    A    Yes.

19         MR. SIMPSON:  Let's mark this as No. 5.

20             (Purnell Deposition Exhibit No. 5

21             was marked for identification.)

22         BY MR. SIMPSON:

Page 197

1      A    Yes.

2      Q    **You certainly would expect to see duties of**

3   **this CG-0201-12 position encaptured in the Summary of**

4   **Duties for this Vacancy Announcement, CG-11/12;**

5   **correct?**

6      A    Yes.

7      Q    **By the way, did you ever review the Report**

8   **of Investigation involved in this issue of the**

9   **complaint of discrimination that Dorothy Chappell-**

10  **Johnson filed?**

11     A    No.

12          MR. SIMPSON:  Let's mark this as No. 6.

13               (Purnell Deposition Exhibit No. 6

14               was marked for identification.)

15          BY MR. SIMPSON:

16     Q    **Have you seen this position description**

17  **before?**

18     A    I believe I have seen this description

19  before.

20     Q    **What makes you think you have seen this**

21  **position description before?**

22     A    I believe that in a prior EEO case in some

1    documentation that I provided that this position

2    description was among documents that were submitted.

3        Q    **In a prior EEO case?  Whose prior EEO case?**

4        A    Dorothy Chappell-Johnson's.

5        Q    **How would you have been privy to that**

6    **information in a prior EEO complaint?**

7        A    My office as the operational unit was

8    responsible for providing documentation to the Office

9    of Diversity and Equal Opportunity or directly to an

10   EEO investigator about what were official position

11   descriptions.

12       Q    **Did you review this position description?**

13       A    I don't recall reviewing the position

14   description.

15       Q    **You would agree it is for a supervisory**

16   **payroll/personnel systems specialist, CG-301-11;**

17   **correct?**

18       A    Yes.

19       Q    **Supervisory?**

20       A    Yes.

21       Q    **Payroll/personnel systems, that would be**

22   **somewhere between the CG-09 and the CG-12 position**

Page 226

1      Q    I'm sorry.  Suzanne?

2      A    Suzanne Moi.

3      Q    That was your determination?

4      A    That was certainly my determination.

5      Q    Did you discuss her application with the

6   other panel members?

7      A    Yes.

8      Q    Did they agree with that assessment?

9      A    I believe they both agreed with that

10  assessment.

11     Q    She was still interviewed; correct?

12     A    She was interviewed.

13     Q    Any other discussion of any other

14  applicants prior to interviews?

15     A    I don't remember anything specific.

16     Q    Do you recall at the start of the interview

17  panel, at some point within that period before the

18  first interview, where you pulled one application out

19  and said "this one looks pretty good, this is the one

20  I want?"

21     A    No.

22     Q    No recall of that?

Page 227

1    A    No.

2    Q    **Words to that effect?**

3    A    No.

4    Q    **Words that sounded like that?**

5    A    No.

6    Q    **Didn't happen?**

7    A    I don't have any recollection that I picked

8    out any one specific candidate to say "this is the

9    one."

10    Q    **Could it have happened?**

11    A    I have no recall of that discussion.

12    Q    **I believe you had indicated at the**

13    **conclusion of each interview, the panel would discuss**

14    **that applicant and how the interview went.**

15    A    Yes.

16    Q    **Would the panel members make a**

17    **recommendation to you about where that applicant**

18    **stood?**

19    A    Recommendations were not made after the

20    individual interviews.  A summary -- after we had

21    interviewed all of the candidates, we had a

22    discussion.

Page 228

1    **Q     What did that discussion entail?**

2         A     What we did was kind of compare our written

3    notes, just to kind of make sure we heard the same

4    kinds of things.  We talked about what experience

5    each of the candidates had.  We kind of went back and

6    looked at the interview sheets with the notes we had

7    compared to their applications, and before we

8    concluded the discussion, we came to a consensus on

9    the top two candidates in our opinions.

10        **Q     There was a consensus between all three of**

11   **you on the top two candidates?**

12        A     That is my recollection.

13        **Q     It is not possible that you had this**

14   **conversation with just you and Eugene Bell on the top**

15   **two candidates, is it?**

16        A     No.

17        **Q     Not at all?**

18        A     No, all three of us were there.

19        **Q     You didn't advise Natalie Tyce during the**

20   **process of the interview panel that it was not hers**

21   **and Eugene Bell's place to discuss how well**

22   **applicants did during an interview; correct?**

Page 229

1    A    Say the question again.

2    Q    **You didn't advise Natalie Tyce during the**

3    **interview panel process from the beginning until the**

4    **last interview, from the time you explained the**

5    **process until the last interview, that it was not**

6    **hers and Eugene Bell's place to discuss applicants**

7    **during that interview panel process?  You never said**

8    **that?**

9    A    No.

10   Q    **That they were not there to provide input**

11   **or make recommendations, you never told her that, you**

12   **never told Eugene Bell that?**

13   A    They were there to provide input to me.

14   Certainly, they could provide recommendations to me.

15   Q    **You told them they could do that?**

16   A    We came to a consensus decision on who the

17   top two candidates were.

18   Q    **Did you tell them at any time from the**

19   **beginning of the panel that they were invited to give**

20   **you their input and recommendations?**

21   A    Absolutely.

22   Q    **You affirmatively told them that you**

Page 230

1    expected them to do that?

2         A     I convened the interview panel because I

3    was looking for their input --

4         Q     Did you tell them affirmatively, Ms.

5    Purnell, that you were looking for their input and

6    recommendations?

7         A     Yes.

8         Q     Did you know any of the applicants

9    personally prior to the convening of the interview

10   panel?

11        A     Yes.

12        Q     Who did you know?

13        A     Dorothy Chappell-Johnson and Suzanne Moi.

14        Q     How did you know Suzanne Moi?

15        A     Suzanne Moi worked in our Information

16   Systems Group in H.R., and she provided reports to my

17   section, data reports, certainly knew her from the

18   various H.R. interactions that we had as a group,

19   talked to her about CHRIS issues.  Talked to her

20   about personnel actions that had not been received,

21   processed and not received.

22        Q     You didn't know Ms. Quattrone prior to the

Page 235

1    panel members who asked questions.

2        Q    No, the applicants.  When the applicants

3    asked questions, who answered the questions from the

4    panel?

5            For instance, when do you think you will

6    make a selection.

7        A    As the selecting official, I would answer

8    that question.

9        Q    And salary?

10       A    I would answer that question.

11       Q    Do you recall any of the applicants asking

12   a question that you did not answer?

13       A    I don't recall.

14           MR. SIMPSON:  Let's mark this as No. 7.

15               (Purnell Deposition Exhibit No. 7

16               was marked for identification.)

17           BY MR. SIMPSON:

18       Q    The Court Reporter has handed you what has

19   been marked as Exhibit 7.  Do you recall seeing this

20   document before?

21       A    Yes.

22       Q    That's Dorothy Chappell-Johnson's

Page 236

1    resume/application; is it not?

2         A    Yes.

3         Q    The first thing, going back to Exhibits 4,

4    5, and 6, the position descriptions that we had gone

5    over before, Exhibits 4 and 5 that represented the

6    H.R. specialist, Information Systems and

7    Compensation, at the grades 11 and 12, they were

8    previously payroll/personnel systems position

9    descriptions; correct?

10        A    Yes.

11        Q    Looking now at Exhibit 7, do you see

12   anything in Ms. Chappell-Johnson's resume on page one

13   that addresses payroll/personnel systems specialist?

14        A    Yes.

15        Q    Do you recall noting at the time that she

16   had performed the duties as a payroll/personnel

17   systems specialist?

18        A    Yes.

19        Q    In fact, on page two of her resume in bold,

20   it shows that for more than six years, she performed

21   duties as a CG-9 and as a CG-11 supervisor?

22        A    Yes.

Page 237

1      Q    Did you make note of that?

2      A    Yes, I noted that.

3      Q    Did you make the connection between her

4 experience as listed here in her resume and the

5 position descriptions that had previously been for a

6 payroll/personnel specialist and supervisory

7 payroll/personnel specialist?

8      A    I noted there were similarities between

9 that and the grade 12 position description.

10     Q    What about the 11?  The 11 started off as a

11 CG-9 payroll/personnel specialist, did it not?

12     A    Yes.

13     Q    The same duties that had been required of

14 the CG-9, payroll/personnel specialist, that evolved

15 into the position description for the CG-201-11,

16 Dorothy Chappell-Johnson had performed those duties,

17 hadn't she?

18      MR. JONES:  Objection to the part of the

19 question that the 9 and 11 were the same.  Assumes

20 facts not in evidence.

21      BY MR. SIMPSON:

22     Q    You can still answer.

Page 238

1      A    As I previously stated, I don't know

2    exactly what was in the grade 9 PD.  I didn't go back

3    and look at a grade 9 PD for this job; no.  I looked

4    at Dorothy Chappell-Johnson's overall experience for

5    the position, and I did look at her application and

6    this information.

7      **Q    And you read it carefully?**

8      A    I read it.

9      **Q    Did you read it carefully?**

10     A    I read the application enough to determine

11   that Ms. Chappell-Johnson had description of the

12   duties she performed, some of the duties that were in

13   the position to be filled were also stated in her

14   application.

15     **Q    Why don't you go to Exhibit 3, the Vacancy**

16   **Announcement, and why don't you tell me, in the**

17   **Summary of Duties, on page two of Exhibit 3, why**

18   **don't you tell me what duties in the Summary of**

19   **Duties are not captured in her application/resume?**

20          MR. JONES:  Objection to the extent the

21   documents speak for themselves.  You can answer.

22          (Witness reviewing documents.)

Page 239

1          THE WITNESS:  Could you repeat the

2   question?

3          BY MR. SIMPSON:

4      Q    **What in the Summary of Duties' expectations**

5   **here as listed in the Vacancy Announcement are not**

6   **captured in her resume?**

7      A    She doesn't -- I haven't done a thorough

8   review, but I don't see any description mentioned of

9   CHRIS.  I do see the NFC experience.  The summary

10  description talks about being the senior technical

11  advisor on payroll matters.  I saw the

12  troubleshooting and that kind of thing.  I saw back

13  pay calculations and making retroactive payments.

14     Q    **Look at page three of her resume, it starts**

15  **with "Resolved complex problems."  That is part of**

16  **what's required in here; right?**

17     A    That's part of it; yes.

18     Q    **The next one "Reviewed and approved salary**

19  **advances and other forms of pay."**

20     A    Yes.

21     Q    **Number four, "Served as a senior technical**

22  **advisor on payroll/personnel operations matters."  Do**

Page 240

1    you see that?

2        A    But again --

3        Q    **She covers that, doesn't she?**

4        A    She covers it in a general way.  It doesn't

5    say she is handling the most complex and sensitive

6    issues.

7        Q    **Like what?**

8        A    It could be an issue involving a back pay

9    claim that was so sensitive that they wanted the

10   highest grade level that we had to be involved with

11   that.

12       Q    **Go down a couple of bullets, it says**

13   **"Resolved most difficult and sensitive issues**

14   **involving executive level appointees."**

15       A    Okay.

16       Q    **You see that; yes?**

17       A    "Involving executive level appointees."

18   That doesn't mean that was necessarily the most

19   complex issue that arose related to pay and

20   compensation.

21       Q    **Did you ask her any specific questions**

22   **about her resume?**

Page 241

1    A    During the interview, I only asked

2    questions related to the specific questions and

3    benchmarks, the questions and benchmarks.

4    **Q    You still had a requirement to review the**

5    **resume/application of each applicant; yes?**

6    A    Yes.

7    **Q    You would agree she addresses the issues**

8    **that are in the Summary of Duties, doesn't she?**

9    A    In her application, she does reference

10   those.

11   **Q    At the bottom of page two, the last bullet,**

12   **"Served as liaison with the NFC and FDIC**

13   **payroll/personnel operations section conducting and**

14   **resolving broadband analyses of National Finance**

15   **Center and recommending solutions to complex**

16   **problems."**

17   A    Yes.

18   **Q    She did that.  If you look at page one.**

19   A    Of her application?

20   **Q    Yes, ma'am.  The fourth bullet down,**

21   **"Investigate and respond to a variety of recurring**

22   **and complex issues such as compensation, pay,**

Page 242

1  overtime including FLSA and other pay related

2  problems."

3      A    Yes.

4      Q    "Resolve complex compensation and

5  payroll/personnel problems such as dual lump sum

6  payment, FLSA problems and back pay problems."

7      A    Uh-huh.

8      Q    She addresses them all, doesn't she?

9      A    Yes.  She states it in her application.

10     Q    Back over to page three of the resume,

11  about halfway down, "Prepared reinstatement,

12  discrimination cases and back pay settlement cases

13  against former and present employees as well as a

14  variety of garnishments, such as child support,

15  default on educational loans, bankruptcies, IRS

16  levies and private sector debts against employees'

17  wages," correct?

18     A    It's there.  Yes, sir.

19     Q    "Authorized retroactive payments to

20  employees resulting from discrimination complaints,

21  lawsuits and higher duty work claims and other

22  actions against corporation."

Page 243

1    A    Yes.

2        Q    **It would seem her resume captured --**

3    A    It seems she covered that in her resume;

4    yes.

5        Q    **Did you believe she did all these things**

6    **she said she did?**

7    A    I had reason to question the level of

8    detail of what she stated.

9        Q    **And why did you have a reason to question**

10   **that?**

11   A    Because of what I call her inability to

12   articulate what she did when she was asked in the

13   interview, specific questions, as it related to some

14   of these items.

15       Q    **Did Natalie Tyce have a discussion with you**

16   **about Ms. Chappell-Johnson's capabilities to do the**

17   **job?**

18   A    If I remember the discussion, I think the

19   discussion was that it was good, it was the consensus

20   of the group that any of the three candidates could

21   probably do the job.  The question was who we felt

22   had the requisite skills to perform the job the best.

Page 286

1   there.  When did we do the interview?  It could be

2   2/30.

3       Q    Do you remember when the selection was

4   announced?

5       A    No, I don't recall when it was announced.

6       Q    It looks like the third paragraph after

7   that you meet with Dorothy Chappell, the paragraph

8   says "While I felt she was within the top three

9   candidates, there were two other individuals I

10  thought were the top contenders for this position."

11      A    Yes.

12      Q    That was based on a consensus of the

13  interview panel?

14      A    Yes.

15      Q    Again, "consensus" being unanimous?

16      A    Yes.

17      Q    It would surprise you if I told you Natalie

18  Tyce has testified that Ms. Quattrone was not in her

19  top two?

20      A    That would surprise me.

21      Q    Number two starts at the bottom of the

22  first page, "Asked about a complex payroll or pay

1      A    I did not do a reference check on her.

2      **Q    You didn't consider KSAs four and five for**

3  **Ms. Chappell-Johnson, did you?**

4      A    Let me look at the KSAs.  I'm not quite

5  sure --

6      **Q    You are saying right here, your statement**

7  **is --**

8      A    You asked the question did I consider her

9  for KSAs four and five.  I don't know what KSAs four

10  and five are without looking at them.  Where the

11  statement says they were better evaluated through a

12  reference check, it didn't say that you couldn't

13  answer -- ask questions in the structured interview

14  process for them.

15      **Q    Let's look at Exhibit 3, page three of**

16  **four.  I don't remember seeing any questions in the**

17  **six questions that addressed any of that, do you?**

18      **Ms. Purnell, were any of the structured**

19  **interview questions dealing with KSAs four or five?**

20      A    No, not specifically.

21      **Q    You did not address those with Ms.**

22  **Chappell-Johnson during the interview panel, did you?**

Page 301

1       A     No.

2       Q     The only evaluation conducted on any of the

3   applications for KSAs four and five were done through

4   reference checks; correct?

5       A     That's correct.

6       Q     Therefore, Ms. Purnell, you did not

7   consider all five KSAs for Ms. Chappell-Johnson, did

8   you?

9             You only conducted reference checks for the

10  top two.

11      A     That's correct.

12      Q     That was your earlier testimony; right?

13  Yes or no?  Right?

14      A     I'm not comfortable answering the question

15  as stated.

16      Q     Your earlier testimony was you only

17  conducted reference checks for the top two

18  candidates?

19      A     That is correct.

20      Q     Your testimony was that Ms. Chappell-

21  Johnson was not one of the top two candidates?

22      A     That is correct.

Page 303

1    that information.

2        Q    Did you evaluate Ms. Chappell-Johnson

3    against KSAs four and five during this process?  Yes

4    or no?

5        A    I'll say no.

6        Q    Thank you.  Paragraph nine, second line,

7    actually starting at the end of the first line, "I

8    was impressed with her experience," "her" being the

9    selectee, "working with lots of pay differential

10   issues."

11           What were the "lots of pay differential

12   issues" that she worked?

13       A    The language -- I considered all of these

14   to be differentials.  The language differential, the

15   post differential.  I can't recall the other.

16       Q    Two and three are "lots," correct, based on

17   what you say here?  Is that your definition of

18   "lots," two or three?

19       A    I would say "lots" would be more than two

20   or three.

21       Q    I would, too.  Your word is "lots."

22       A    Okay.

Page 304

1          Q     You also say a couple of sentences later

2     "Patricia had responsibility for many of these

3     different types of calculations on a regular basis."

4      How did you come to the conclusion that she did it

5     "on a regular basis?"

6          A     I would look at the -- if I remember

7     correctly, the reference check from her supervisor

8     indicated that she routinely did those things.

9          Q     You didn't do a reference check on Ms.

10    Chappell-Johnson, did you?

11         A     I did not.

12               MR. JONES:  Objection.

13               BY MR. SIMPSON:

14         Q     There is nothing to compare to that, is

15    there?

16         A     No.

17         Q     Ms. Chappell-Johnson's resume included the

18    fact that she had done lots of different types of

19    calculations on a regular basis, didn't it?

20         A     Yes.

21         Q     You didn't need to check her references to

22    know that, did you?

Page 305

1    A    The information was in her application.

2    Q    **You didn't believe it, did you?  You had**

3    **reason not to believe it; correct?**

4    A    That is what I stated earlier.

5    Q    **That was based on what?**

6    A    That during the interview process, she did

7    not articulate very well what it was that she had

8    done.

9    Q    **But her resume contained that information,**

10    **didn't it?**

11    A    Yes, the resume is one source of

12    information.

13    Q    **The next line, "I did not think that years**

14    **of experience were relevant since only one year at**

15    **the next lower grade was required."  What do you mean**

16    **there?**

17    A    That is the standard for experience

18    required by the U.S. Office of Personnel Management

19    for experience to be promoted to the next higher

20    level grade, one year.

21    Q    **Yet you saw in Ms. Chappell-Johnson's**

22    **resume that she had done the CG-9 and the CG-11**

Page 308

1    Q    Do you think she was lying in her

2    resume/application, Ms. Purnell?

3    A    No.

4    Q    You had no reason not to believe that what

5    she put in there was true, do you?  It can only be

6    one way or the other, can't it?

7         MR. JONES:  Objection.

8         MR. SIMPSON:  Your objection?

9         MR. JONES:  Assumes the answer has to be

10   one way or the other, either she's lying or

11   everything is absolutely true.

12        MR. SIMPSON:  Either she's lying or telling

13   the truth.  It has to be one or the other.

14        BY MR. SIMPSON:

15   Q    True, Ms. Purnell?

16   A    No.  I don't think it's true.  I think --

17   my experience in H.R. over years, employees will

18   often put everything that's in their position

19   descriptions in their applications.  In fact, they

20   don't always perform the full range of duties as

21   described in their position descriptions.

22   Q    There was a way to check that, wasn't

Page 309

1      there?  You call her supervisor and ask the

2      supervisor.  That would have verified it, wouldn't

3      it?

4          A    Who was her supervisor at the time?

5          Q    You could have done that, couldn't you?

6          A    Yes.

7          Q    That would have verified the information in

8      there, wouldn't it?

9          A    Yes.

10         Q    But you didn't do that, did you?

11         A    No.

12         Q    Number 18, page four of five, the last

13     sentence, "I'm aware of her, being Chappell-Johnson,

14     "prior EEO activity because I provided information in

15     response to resolution efforts and worked with our

16     lawyers."

17              The information that you provided was a

18     settlement work up, wasn't it?

19         A    Yes.

20         Q    For Mr. Torrado?

21         A    Yes.

22         Q    You know Mr. Torrado spoke to Ms. Chappell-